Brian Dawson, representing the Plaintiff and Appellant, Claudia Stunnen. I would like to reserve two minutes for rebuttal. Sure. The critical issue on this appeal and in this case is, was payment made and was payment accepted for this insurance policy? The clear evidence on that issue is that payment was made and accepted. A check for $20,000 for the amount of the premium for the initial year on this policy was paid to AmerUS in July of 2002. It was received by AmerUS in mid-July of 2002. And we have documents showing the use of that money. It wasn't just a matter of a check being sent in and held. It was a matter of AmerUS receiving the check, transferring funds out of its own accounts and out of the holding account for the plaintiff and transferring it to itself, into its own accounts and paying its agent a commission. The question is, what basis did AmerUS have for doing that, taking money that was paid by the applicant and paying itself and paying its agent? The only answer to that question can be that there was a contract in place. AmerUS had a contractual right to that money. With a contract in place, that contract benefits both sides. AmerUS got to take the money out of the account and pay itself, but it also had to provide life insurance. That life insurance remained in place at the time of Patrick's son's death. If they had just put the money in a checking account, that would change the result of the case? If they had just held the check, I think it would remove that issue. I don't think it would change the result of the case, but it certainly would present a different issue of fact. Suppose it doesn't matter to us which account they put it in. Then what happens? Overall on the case? Yes. Then I think you go to the issue of, was there an agreement? Under Oregon law, there doesn't have to be payment. There just has to be an agreement about the amount of the payment. That was agreed in this case. The clear evidence is $20,000 was a premium amount. Then you also have to go to the second issue of, was there a condition precedent, and was that satisfied in this case? But I think the key — How was it satisfied? I'm sorry, Your Honor? How could any condition precedent have been satisfied in this case? The condition precedent, and I have a blowup referring to the exact language used in the policy. If it would help the panel, I would put that up, and we can talk about how it would be satisfied in this case. I understand the language, but I also understand that at the time it was accepted by them, by the client, when the policy was set up, they had to indicate that his condition was the same as it had been. Clearly it was not. Isn't that right? I think the timing of when that analysis is done is very important in this case. Let's say the analysis was done at the time they sent the policy to the insurance agent. Clearly at that time he was in a much different physical condition than he had been at the time he originally applied, was he not? I think there's contrary evidence of that where some of the — His wife was calling and saying, We've got to have this thing. We've got to have this appointment sooner. He's feverish. He's throwing up. He's a very sick man. We've got to get him to see the specialist. That was at least by July 31st and probably July 23rd. She was making that exact example. Now, are you suggesting that at that time his condition was just fine, just like it had been before? There is certainly evidence of that. There is evidence that he was carrying on with life, that he was working, that this could have been the side effects. That's right. I'm talking about a very sick man. You know, sometimes people carry on their lives just fine. We just had a judge down south in California die. He died within four days after he went in the hospital. Filled with cancer. He was carrying on his life just fine up to that point. The point is, the question I'm asking is, can you really say that this guy was in the same condition, doing the same? If he had applied on July 23rd, he could have said, I'm fine. I'm running fevers and I'm throwing up and I'm sick all the time and my joints are hurting and everything's bad, but I'm just fine condition. He could have honestly represented that? I think that there's evidence to that effect under the standard for summary judgment, Your Honor. And I think that looking at the exact terms of the policy, they don't ask about general health. By August 22nd or 23rd, what do we say about that, if that's the acceptance date? By that time, he had had a diagnostic test done. And so looking at the terms of the policy, if the delivery date is after that date, so in late August, then the terms of the policy and if the condition precedent applies, then that would be, it would not be complied with in this case. But I think delivery in this case happened in early August. And at the time, if you look, if you compare the language of the policy, the language of what's purported to be the condition precedent and you compare it to what treatment was, what Mr. Sonnen's condition was, they don't ask in the purported condition precedent or in the application about a general state of health, if he was still in good health. They ask about whether he had seen doctors, seen doctors, gone in to see them, not made phone calls. He had not done that. Phone calls had been made by his wife to the doctor's office at the time that the endorsement was mailed directly to them. Under Oregon law, an endorsement is part of the policy. At the time that that was mailed to him and at the time that the rest of the policy was mailed to Agent Perry, he had not seen another doctor other than going in to Dr. Magsirelli on July 2, 2002. That was disclosed to him there. He had not gone in. The significance of the fact that they send this amended application with the policy, he scratches it out and writes something else in. When the company gets it back, they decide they no longer want to issue the policy. What's the significance of that? I think the policy was already in place well before any of that happened. I think that the policy was in place, first of all, when they transferred the money into their own funds, paid the insurance agent $11,000 out of the policy. You think he could scratch out any term he wants and send it back? I think there's a policy in place by that time and had been for a month. They had already taken a second, by that time, cost of insurance payment. And, again, I think it goes back to on what basis did they do that if there wasn't a contract in place? I want to go back to the questions that Judge Fernandez was asking you about the answers on the application and whether they continue to be true. You focused on the question whether he'd seen doctors, but he was also asked whether he has had symptoms of any disorder of the stomach, digestive tract, et cetera. And the symptoms that Judge Fernandez was asking you about would no longer permit, it seems to me, an honest answer of no, that he's not had those symptoms. That was disclosed to Ameris. He disclosed on two occasions. He disclosed in the application itself. Well, he didn't. He answered no to that question. But it says in an earlier page of the application that he'd had stomach problems that those had resolved six months before. That's the problem. That was no longer true because they may have resolved, but then they came back or something worse came back. Right. But he disclosed in the telephone interview report, so that was July 9, 2002, that he had stomach problems at that point too. So he'd given them notice of the stomach problems, whatever the problems were, whatever the source of them were. And another issue is were they a symptom of a disease or were they a side effect of cholesterol medication? Nobody knew at that time. And looking back in retrospect, it's possible to say what they might have been and what they might not have been. Thank you, Your Honor. I reserve the remaining time. Awesome. Morning. Good morning, Your Honors. My name is Mike Pearson. I represent Ameris Life Insurance Company. The basic question here on this appeal is what the plain language of the policy-related documents is and what those terms and conditions are. Under Oregon law, the interpretation of an insurance policy and a life insurance policy like this is a question of law based on the particular terms, written terms and conditions, the policy taken as a whole. Here, the district court properly decided this on summary judgment. Both parties had moved for summary judgment on cross motions. The district court decided it on two grounds, and really there are three separate strong grounds for upholding the district court's decision, both the two the district court relied on and a third. This really is a case that comes down to very clear, plain language of the relevant policy documents and also to several Oregon cases that are clear and that are directly on point. I don't think we heard any mention of them in the opening argument, but the Morford case and the Simmons case and the Olson case and the Krause case, I would say, are the four most important cases and really resolved this clearly on the first two grounds in favor of Ameris. This is the district court held. On the first ground, it's well-established and really fundamental contract and certainly insurance contract principles that the insurance company has the right to respond to an application with a counteroffer with different terms, and that's what Ameris did here. There's no genuine issue of material fact that what the insurance company did, what Ameris did was say, look, we've looked at your medical tests. We've looked at the other information you've submitted, and based on that we will insure you, but on a table two rated basis, and that is going to cost you 50% or so more than what you thought you were going to pay and what you would be paying in connection with the application that you submitted. It's well-established under Oregon law, and specifically the Morford case, that the insurance company has the right, as Ameris did here, to condition acceptance of that counteroffer on specific written acknowledgement and agreement. Does it matter what the company did with the money that was forwarded to it? It doesn't matter, Your Honor. Under Oregon law, the key issue is whether or not the insurance company retains or returns that premium. Here, Ameris returned it as soon as it found out that Mr. Sonnen had modified the amendment and, in fact, had terminal cancer and could not and had not validly accepted the counteroffer. And it really doesn't matter what was happening at Ameris' end. It returned the premium, the full amount, and there's no question about that. It's not disputed, and there's no case that Mr. Sonnen cites, Oregon or otherwise, that would suggest that where the full premium is returned like that, there's any problem with that at all. In fact, the Morpher case is concrete. When you say the answer, you're talking about, what do you call it, August 22nd or 23rd, when you did assign the acceptance? I think there's an argument that it was about, what, July 31st or something, when you sent it to the agent, and he was suggesting that the agent receiving it was the acceptor. They've argued that, Your Honor. That's contrary to Oregon law. The key case on that point, actually both Morpher and Krauss are contrary to that. In Krauss, the court made it very clear that where the insurance company sends back terms which does not unconditionally accept the application's term, but sends something back tied to delivery that the proposed insurer or the owner of the policy, the proposed owner, has to sign, there is no delivery until the proposed insured or applicant actually receives it. And that sending it out is not good enough. Delivering it to the agent is not good enough, regardless of whether that agent is for the insurance company or the proposed insured. It's got to get to the individual. And that did not happen until August 23rd, by which time it's undisputed. He knew, sadly, that he had terminal cancer. Is there a dispute about his condition on July 33rd, which I think is when the policy was sent to the agent? Well, it's clear. I think there is no genuine factual dispute as to his having significant health issues at that point. That's a matter of the medical records, Mr. Sonnen's own medical records. It's also clear that, regardless of his condition, there were certain facts, undisputed facts, that don't go to just exactly how sick he was. He had been scheduled for an appointment with a specialist and directed to see that gastroenterologist for diagnosis and treatment of ongoing problems, which he later described to doctors as having consistently bothered him and gotten worse over the previous year. We do have, as I say, the record from his own doctors in terms of what Mrs. Sonnen and Mr. Sonnen himself were reporting about what certainly, I think to any objective eye, are more and more serious problems all the way along, and they're starting with July 16th, you know, through the time of delivery. The policy has an effective date of July 28th. Is that right? That's what the policy says, Your Honor. But you say it didn't become effective even though it had that date until, what, some other date when it was delivered if it had been? Well, it never – the fact that that's when it was issued and that that's the date stated on it doesn't change or remove the language in the original application that the condition, that he still has to have certain conditions and the representations still have to be true as of the time of delivery, even though that's later. I guess what I'm asking, isn't that a patent ambiguity that there's an effective date that's a month earlier than what you claim would be the effective date? I don't think it is, Your Honor. It's really no different than the Olson case. In the Olson case, and I brought this book, and this was presented at the district court, you know, the material facts of these cases are remarkably similar, really in all material ways identical. And in the Olson case – You said that, but in the Olson case, the client was there when it was 8 to 1, but also the issue is that you stated the problem was 8. It was 8 to 1. It was stated before the proceeding that it was an unexpected date, before delivery. It's identical to this case. And there the Supreme Court of Oregon, sitting on bonk, had no problem deciding 8 to 1 that the condition of proceeding was enforceable regardless of the policy date stated, and regardless of it being prior to the learning of the cancer or delivery, there was no coverage, there was no contract. And that really disposes of this case as well on the second point. What is the significance of the policy date? What purpose does it serve, the effective date? Well, it is the date from which the premium payments are determined, from which the period that's covered, the annual premium payments are determined and all of that. There needs to be some sort of fixed date. What would have happened had, in the Olson case and in this case, on the date the decedent learned that he had terminal cancer, what if he'd been run over by a bus, but his health had been as before? Would there have been coverage because of the policy date, even though the policy had not been delivered? Well, I think at least on the second point of condition proceeding, there still wouldn't have been coverage because it was still tied to delivery of the policy, and in that case delivery had not yet taken place. I have to admit I haven't focused on that particular set of facts, but that's my take on it standing here. It still doesn't get to the first point, which is that in a case like this where you've got a specific counteroffer, materially different term provided by the insurance company, there clearly has to be some sort of written affirmation by the proposed insurer or the applicant that he's accepting those terms. That was specifically held in Morford, where actually in that case the proposed insured had written, here's my application, here's what I want, but Mr. Insurer or Ms. Insurer, I'll take whatever policy you give me. If you think I'm a bigger risk than I think I am, I'll pay for that. And the Supreme Court of Oregon said that's not good enough. You need to let the insurance company come back with a specific term and either say yes to those or no to those. And it's very clear under Morford and the other Oregon cases that the insurance company is entitled to basically cause the proposed insured to take such action that would constitute a waiver of any argument that they haven't completely agreed to the counteroffer. That's very understandable. In this particular case, one can easily imagine a different set of circumstances where if we were ignoring the obligation of the proposed insured to sign a written acceptance of the counteroffer, somebody coming in and saying, what do you mean you'd up the premium by 50 percent? I never agreed to that. The insurance company is entitled to make sure that it gets a specific acceptance of that before there's ever any coverage or ever any contract in place. So I've got 41 seconds. Let me just quickly touch on the third argument. I know the district court didn't reach it. I know there are some disputed facts about the misrepresentation and material omission defense. However, it's quite clear that there are certain very important facts that as an undisputed matter of fact and law would have been material to the insurer's decision, including reference to the specialist, including the ongoing treatment for serious problems, as to which there is no dispute, no genuine issue of material fact. And so that third ground also supports judgment in favor of Ameris. Plain language, clear cases in Oregon law, clear statute, correct decision. Thank you, Mr. Pearson. Mr. Dawson, you've got a couple minutes left. Mr. Pearson has referred to Ameris upping the premium in this case. That was not done. The premium was $20,000 in the application. The policy was $20,000 for the premium. What effect the Table 2 rating had, which was a term known only to Ameris, not disclosed to applicants, including not to Mr. Sonnen, was it affected some of the subcategories? The insurance has gone up. He's just been able to designate less for the investment feature. Isn't that right? But there are several subcategories within this. I think under Oregon law, it's very clear under Olson's case and other cases, the amount of the premium is what there has to be an agreement on. There can be changes within the subcategories, such as the commission paid to Agent Perry was $10,000 in this case. If they tell him you sent us a check for $20,000 and $10,000 gets invested, they can change their minds and say, no, we're only going to invest $2,000. We'll apply $18,000 to the cost of the insurance. If it was clear that $10,000 was going to be invested, in this case it wasn't clear to anybody what the amount was that was going to be invested. Mr. Sonnen knew it was a problem because they right away said, wait a minute, that's a problem. We're going to try to get doctor letters to get that checked. For future. Well, they knew it was different. They wanted to have it changed in future years. They had Dr. Magsarelli write in and say, can you remove this going forward? At the time of the death, the policy was in place. There was an agreement on the amount of the premium. The Olson case is distinct in this case in at least two regards. First of all, in Olson, no part of the policy was ever mailed directly to Olson before he was diagnosed with terminal cancer. In this case, on July 31, 2002, money was taken out of the accounts, and I think that has crucial legal significance in this case. It wasn't held. It wasn't held in miscellaneous trust accounts. It was taken out of those accounts and paid to Agent Perry. But also, on July 31, 2002, part of the policy was mailed directly to the Sonnens. The rest of the policy was sent to Agent Perry. So that changes the timing, and that moves when the diagnosis of cancer was made to a different point in time. It was after delivery occurred. In this case, it was before delivery occurred in the Olson case. Thank you very much, Mr. Dawson. Mr. Pearson, thank you as well. The case just started. You just submitted it. Good morning.
judges: Fernandez, Silverman, Graber